UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WADE ANTHONY MORMAN,

        Plaintiff,

   v.

MICHAEL DYER, et al.,

        Defendants.

Case No. 16-cv-01523-SI

**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 17

     In this *pro se* prisoner's civil rights action under 42 U.S.C. § 1983, Wade Anthony Morman claims that several defendants retaliated against him and others denied him due process. Defendants now move for summary judgment on the merits of Morman's claims and on their defense of qualified immunity, as well as on the ground that Morman did not exhaust administrative remedies for his claims against several defendants. Morman opposes the motion. For the reasons discussed below, defendants' motion for summary judgment will be granted in part and denied in part. Specifically, the motion will be granted as to everything except the retaliation claim against defendants Lee and Heller for the September 14, 2011 search, and their defense of qualified immunity to that claim. The case will be referred to the court's *pro se* prisoner mediation program.

## BACKGROUND

     The court found cognizable three claims in the amended complaint: a claim that four defendants conducted a retaliatory search on September 14, 2011 (Claim 6); a claim that three defendants retaliated against Morman on September 28, 2011 (Claim 7); and a claim that two defendants denied Morman his right to due process in connection with Morman's placement in

administrative segregation on or about December 1, 2011 (Claim 9). *See* Docket No. 8. Several other claims were dismissed. *Id.* Although Morman continues to argue the merits of some dismissed claims in his opposition to the motion for summary judgment, the court will refer to the incidents in the dismissed claims only as necessary to provide background for the three claims that it found cognizable.

A.    The Claims

The following facts are undisputed unless otherwise noted:

Morman was an inmate at the Correctional Training Facility in Soledad in August and September 2011. In or before December 2011, he was transferred to San Quentin State Prison.

1.    The September 14, 2011 Search

Correctional staff at the Correctional Training Facility routinely conducted searches of inmates and their property for contraband. Some of the searches were random. *See* Docket No. 17-4 at 2. Searches of inmates' cells, property, and bodies were authorized by California Code of Regulations, title 15, § 3287. The searches included searches of written materials that could contain contraband. Docket No. 17-4 at 2. Correctional officers conducted random searches to identify and confiscate contraband, and to discourage inmates from bringing more contraband into the facility. *Id.*; Docket No. 17-5 at 2. Items that are not approved or accounted for are disallowed under California regulations. *See* Cal. Code Regs. tit. 15, §§ 3190-3192.

In late August 2011, Morman verbally objected to correctional staff that he had been subjected to too many searches by correctional officer ("C/O") Quintero and had been given a "wedgy" during one of those searches. Docket No. 7 at 5. Morman states that C/O Heller then told Morman to "'shut the fuck up; pick up your shit and get out of here!,'" and that Morman responded that it "was not necessary to use such tone and profanity against the plaintiff and that it was in violation of prison policy." *Id.* at 6.[1] At the time, C/O Michael Dyer said to Morman and

---

[1] The court earlier dismissed claims regarding the August 2011 events because, among other things, they were barred by the statute of limitations. *See* Docket No. 8 at 2-6.

correctional staff, including Heller and Lee, "'I didn't hear no profanity,'" and C/O Dyer "sarcastically ask[ed] Heller and Lee, "'did you hear any profanity?'" *Id.* at 7. Morman accused Dyer of siding with his officers and pretending not to notice their lack of respect for Morman. *Id.*

In the several weeks following that late August 2011 search, Lee directed several negative comments toward Morman: While Morman was walking and talking to another inmate on August 25, 2011, C/O Lee stared at Morman and ordered him to "shut the fuck up and keep walking!'" *Id.* at 8. On or about August 25, 2011, C/O Lee "intruded into Plaintiff's consideration with another inmate" and said that he would not stop another inmate from beating up Morman; insulted Morman because of his sex offenses; and rushed to within two feet of Morman. *Id.* at 9. On or about September 2, 2011, C/O Lee told Morman that he was staring at him because Morman was ugly. *Id.* at 10. Although claims based on these incidents have been dismissed for the reasons stated in the order of partial dismissal and service (Docket No. 8), the incidents described in this paragraph are recounted to provide a backdrop for what occurred on September 14, 2011.

On or about September 14, 2011, C/O Heller selected Morman from among numerous inmates for a search of his person and property, and said to other staff members, "we're harassing him!" Docket No. 7 at 11. C/O Lee "laugh[ed] gloatingly" and searched Morman's property. *Id.* Lee "shielded his search" of Morman's property so that Morman could not see it. *Id.* Morman thinks (but does not explain how he could have seen since the search was shielded from his view) that Lee read Morman's legal property, which included written grievances. *Id.* at 11. C/O Lee also took some personal property and damaged other personal property. *Id.* at 11-12. C/O Taylor encouraged C/O Lavelle to confiscate art pastels found during the search and verbally insulted Morman. *Id.* at 12. C/O Lavelle confiscated the art pastels because they were not included on the property card that detailed the inmate's authorized possessions. Docket No. 17-5 at 2. Lavelle provided a property receipt for the confiscated pastels and marked that they had been confiscated because they were "unauthorized." *Id.* at 5. Morman presents no evidence that the art pastels were not contraband.

Morman states that the defendants' actions were taken because of (a) Morman's August 2011 complaints about the searches and correctional officers, (b) Morman's convictions for sex

3

offenses, and (c) "information included in plaintiff's prison record." Docket No. 7 at 11.[2]

2.      September 28, 2011 Search and Hearing on CDCR-22s:

When inmates are subject to movement within a prison outside of the regular schedule, such as when they are taken to an appointment or interview, they must be escorted by staff. Docket No. 17-4 at 2; Cal. Code Regs. tit. 15, § 3274(b)(2) ("If unscheduled movement of an inmate is necessary, such movement shall not take place unless the inmate is escorted by staff, or a pass has been issued by staff authorizing the movement."). C/O Lee states that he "regularly searched for contraband in connection with the escort to ensure [his] own safety, the safety of other officers, and the safety of other inmates during the escort. [He] also secured inmates in holding cells to ensure the safety of officers and inmates." Docket No. 17-4 at 3.

Sometime before September 28, Morman filled out several CDCR-22 forms. The CDCR-22 form is an "inmate/parolee request for interview, item or service," and is described in California Code of Regulations, title 15, § 3086. That regulation provides: "Inmates and parolees may request interviews with staff and/or request items and services via a written request process. The objectives of timely resolution of routine matters through an effective and non-conflictive communication process shall be facilitated by the practices set forth in this article." *Id.* at § 3086(a). The CDCR-22 form process works separately from the inmate appeal process that is commenced with the filing of a CDCR-602 form. *See id.* at § 3086(e)(2).

---

[2] Morman states specifically that one of the reasons for defendants' conduct was because of his "California Penal Code § 290 convictions." Docket No. 7 at 11. California Penal Code § 290 imposes a sex-offender registration requirement on certain sex offenders. It is not clear whether Morman means that defendants retaliated against him because he had been convicted of a violation of § 290 or because he was someone to whom § 290 applied. In 2011, Morman was serving an indeterminate life sentence following his conviction for rape and other sex crimes against two victims. *See People v. Morman*, 2008 WL 4696606 (Cal. Ct. App. 2008). According to the California Court of Appeal, when he committed those rapes, Morman already had a lengthy criminal record that may have included more sex crimes. *See id.* at *9 (listing Morman's criminal convictions between 1989 and 1993; "[d]uring this time period, he violated both his probation and parole and was also found guilty of rape, oral copulation, forcible anal and genital penetration, and assault with a firearm").

4

Morman was subjected to a search on September 28, 2011 by C/O Lavelle. Docket No. 7 at 14. C/O Lee ordered Morman to go to a job location in the medical facility. *Id.* At the medical facility, C/O Lee gathered copies of three CDCR-22 forms that Morman had written about the conduct of Lee, Dyer and other officers. Lee ordered Morman to go upstairs with him to have a hearing on the CDCR-22 forms. *Id.* at 15. Morman refused, saying he was afraid to be alone with Lee and wanted the grievances heard by a supervisor or to be responded to in writing. *Id.* C/O Lee threatened to drag Morman up the stairs. *Id.* Pursuant to sergeant Dyer's orders, C/O Lee handcuffed Morman, took him upstairs, and put him in a holding cell. During the escort, Lee pushed Morman into a wall and left him in tight handcuffs in the holding cell for about 30 minutes. *Id.* Sergeant Dyer took "an aggressive stance" and "chased [Morman] around in attempts to provoke [Morman] to physically fight him," but no physical contact occurred. *Id.* at 16. Dyer also attempted to convince Morman to leave him (Dyer) out of the complaints. *Id.* at 17. Morman refused to drop the complaints. The CDCR-22 forms were returned to him, without Dyer having "record[ed] any facts regarding the forced [] hearing." *Id.*

Morman states that the defendants' actions were taken because of (a) Morman's earlier complaints about the searches and correctional officers, (b) Morman's convictions for sex offenses, (c) "information included in plaintiff's prison record;" and (d) because Morman had filed the grievances. *Id.* at 17.


### 3. December 1, 2011 Administrative Segregation Placement

Morman was transferred to San Quentin State Prison some time after the above described incidents. On or about December 1, 2011, correctional captain Evans and correctional sergeant Kilmer caused documents to be filed at San Quentin State Prison to "falsely reflect" that Morman was properly housed in administrative segregation. *Id.* at 19. Morman was not provided a proper notice or hearing in connection with his placement in administrative segregation. *Id.*

B.      Inmate Appeals

Morman pursued three inmate appeals starting in late 2011.  He filed an inmate appeal dated September 22, 2011 (log # CTF-11-01755), in which he complained about C/O Lee's behavior on August 25, 2011.  *See* Docket No. 17-3 at 8-11.  He filed another inmate appeal dated October 5, 2011 (log # CTF-11-01820), in which he complained about a search on September 28, 2011.  *See* Docket No. 19-1 at 8-11.  He filed a third inmate appeal, also dated October 5, 2011 (log # CTF-11-01821), in which he complained about a search and other events occurring on September 14, 2011. *See* Docket No. 19-1 at 15-17.  The third-level appeal for this last appeal was signed by Morman on January 5, 2012.  *Id.* (§ F).  Morman submitted his January 5, 2012 third-level appeal after his December 1, 2011 placement in administrative segregation.  All three inmate appeals were denied at the third level of review.

Morman did not file any inmate appeal pertaining to his placement in administrative segregation or mentioning captain Evans and correctional sergeant Kilmer.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Generally, as is the situation with defendants' challenge to the retaliation claims, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the

nonmoving party to "go beyond the pleadings, and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.

When a defendant moves for summary judgment on an affirmative defense on which he bears the burden of proof at trial, he must come forward with evidence that would entitle him to a directed verdict if the evidence went uncontroverted at trial. *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). The failure to exhaust administrative remedies is an affirmative defense that must be raised in a motion for summary judgment. *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc). On a motion for summary judgment for nonexhaustion, the defendant has the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Id.* at 1172. If the defendant carries that burden, the "burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* The ultimate burden of proof remains with the defendant, however. *Id.* If material facts are disputed, summary judgment should be denied, and the "district judge rather than a jury should determine the facts" on the exhaustion question, *id.* at 1166, "in the same manner a judge rather than a jury decides disputed factual questions relevant to jurisdiction and venue," *id.* at 1170-71.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746,

plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, Morman's amended complaint is verified (*see* Docket No. 7 at 23), and therefore is considered as part of the evidence in opposition to defendants' motion for summary judgment.

**DISCUSSION**

A.      Plaintiff Failed To Exhaust Administrative Remedies For His
        Claims Against Evans and Kilmer (Claim 9 in Amended Complaint)

        1.      Exhaustion Requirements

"No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Ross v. Blake*, 136 S. Ct. 1850, 1856-57 (2016) (mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). All available remedies must be exhausted; those remedies "need not meet federal standards, nor must they be 'plain, speedy, and effective.'" *Porter*, 534 U.S. at 524. Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit. *Id.*; *Booth v. Churner*, 532 U.S. 731, 741 (2001). Section 1997e(a) requires "proper exhaustion" of available administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Proper exhaustion requires using all steps of an administrative process and complying with "deadlines and other critical procedural rules." *Id.* at 90.

An inmate "need not exhaust *unavailable* [remedies]." *Ross*, 136 S. Ct. at 1858 (emphasis added). An administrative remedy is unavailable if, for example, "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; or if it is "so opaque that it becomes, practically speaking, incapable of use"; or if "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859–60.

8

The State of California provides its inmates and parolees the right to appeal administratively "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." Cal. Code Regs. tit. 15, § 3084.1(a). In order to exhaust available administrative remedies within this system, a prisoner must proceed through three formal levels of appeal and receive a decision from the Secretary of the California Department of Corrections and Rehabilitation or his designee. *Id.* § 3084.1(b), § 3084.7(d)(3).

The amount of detail in an administrative grievance necessary to properly exhaust a claim is determined by the prison's applicable grievance procedures. *Jones v. Bock*, 549 U.S. 199, 218 (2007); *see also Sapp v. Kimbrell*, 623 F.3d 813, 824 (9th Cir. 2010) ("To provide adequate notice, the prisoner need only provide the level of detail required by the prison's regulations."). California prisoners are required to lodge their administrative complaint on a CDCR 602 form. The level of specificity required in the appeal is described in a regulation:

> The inmate or parolee shall list all staff member(s) involved and shall describe their involvement in the issue. To assist in the identification of staff members, the inmate or parolee shall include the staff member's last name, first initial, title or position, if known, and the dates of the staff member's involvement in the issue under appeal. If the inmate or parolee does not have the requested identifying information about the staff member(s), he or she shall provide any other available information that would assist the appeals coordinator in making a reasonable attempt to identify the staff member(s) in question. [¶] The inmate or parolee shall state all facts known and available to him/her regarding the issue being appealed at the time of submitting the Inmate/Parolee Appeal form, and if needed, the Inmate/Parolee Appeal Form Attachment.

Cal. Code Regs. tit. 15, § 3084.2(a)(3-4).[3]

---

[3] Several Ninth Circuit cases have referred to California prisoners' grievance procedures as not specifying the level of detail necessary and instead requiring only that the grievance "describe the problem and the action requested." *See Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (quoting Cal. Code Regs. tit. 15, § 3084.2); *Sapp*, 623 F.3d at 824 ("California regulations require only that an inmate 'describe the problem and the action requested.' Cal. Code Regs. tit. 15, § 3084.2(a)'"); *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) (when prison or jail's procedures do not specify the requisite level of detail, "'a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought'"). Those cases are distinguishable, however, because they did not address the regulation as it existed at the time of the events complained of in this action. Since January 28, 2011, the operative regulation has required California prisoners using the CDCR's inmate appeal system to list the name(s) of the wrongdoer(s) in their administrative appeals.

2.    Analysis

Defendants have moved for summary judgment on the ground that Morman did not properly exhaust administrative remedies for his claims against defendants Evans and Kilmer because he did not file any inmate appeal concerning their alleged failure to provide required procedural protections for Morman when he was placed in administrative segregation on December 1, 2011.

Defendants have carried their burden to demonstrate that Morman did not properly exhaust those available remedies as to claims against Evans and Kilmer. The undisputed evidence shows that California provides an administrative remedies system for California prisoners to complain about their conditions of confinement, and that Morman used that California inmate appeal system to complain about some events that gave rise to his amended complaint. The undisputed evidence also shows that the only inmate appeals filed pertaining to events alleged in the amended complaint that received a decision at the third level did not assert any wrongdoing by defendants Evans or Kilmer. It is undisputed that: (1) Morman filed only three inmate appeals in and after late 2011 relating to the events giving rise to his amended complaint that received a decision at the third, or highest, level; and (2) none of those three appeals mentioned Evans or Kilmer or pertained to the alleged wrongdoing of Evans or Kilmer. Defendants met their initial burden to prove "that there was an available remedy, and that [Morman] did not exhaust that available remedy." *Albino*, 747 F.3d at 1172.

Once defendants met their initial burden, the burden shifted to Morman to come forward with evidence showing that something in his particular case made the existing administrative remedies "effectively unavailable to him." *Id.* Morman failed to make the requisite showing. He declares: "I felt that there was not [sic] use in trying the appeals process and feared that further retaliation would come to me if I continued to file appeals in regards to my placement in the ASU. At times, I felt that I have to try anyways but my belief was that process would just continue to be unfair and not provide me any process of fairness." Docket No. 18 at 22.[4] Morman's statement

---

[4] Morman contends that he was harassed by an unidentified member of the correctional staff at San Quentin in the period from April 2012 through November 2012 after that staff member

10

does not show that administrative remedies were effectively unavailable. His statement shows that he chose not to use a process that he knew was available. His presumption that the administrative appeal process would be futile does not show that process was unavailable. His contention that he did not file an appeal because he feared further retaliation is not credible because he *did* pursue an inmate appeal after his placement in administrative segregation, albeit about a different problem: a month after his December 1, 2011 placement in administrative segregation, he signed and submitted his third-level appeal of the inmate appeal he had started on October 5, 2011 at the Correctional Training Facility. *See* Docket No. 19-1 at 15, 17 (§ F). Moreover, by that time, Morman had been moved to San Quentin, away from the Correctional Training Facility where the alleged retaliation of August and September 2011 had occurred. Morman has not met his burden to show that administrative remedies were effectively unavailable to him.

Morman failed to properly exhaust his administrative remedies as to defendants Evans and Kilmer. *See Ngo*, 548 U.S. at 90-91 ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.") Bearing in mind that defendants have the ultimate burden of proof on the defense and viewing the evidence in the light most favorable to Morman, the court concludes that defendants Evans and Kilmer are entitled to judgment as a matter of law on the affirmative defense that Morman failed to exhaust administrative remedies for his § 1983 claims against them.

Due to the differences between the unexhausted claim against Evans and Kilmer and the exhausted claims against other defendants, the unexhausted claim can be dismissed while the exhausted claims against are separately adjudicated. That is, the entire action need not be dismissed based on the non-exhaustion of the claims against two of the seven defendants. *See*

---

looked at his prison records which Morman believes included information about Morman's grievance-filing activity and Morman's sex offense history. By the time the unidentified member of the correctional staff allegedly harassed him, more than four months had passed since the alleged misconduct of defendants Evan and Kilmer; Morman does not explain why he was unable to pursue an administrative remedy during those months. (If Morman wants to pursue a legal claim against that unidentified staff member regarding that harassment, he can file another civil rights action under 42 U.S.C. § 1983 but would need to learn that person's identity and exhaust administrative remedies before filing such a claim.)

*Jones v. Bock*, 549 U.S. 199, 222-24 (2007) (rejecting "total exhaustion-dismissal" rule); *Lira v. Herrera*, 427 F.3d 1164, 1175 (9th Cir. 2005). The claim against defendants Evans and Kilmer (i.e., Claim 9) is therefore dismissed without prejudice to Morman filing a new action alleging that claim if he ever properly exhausts his administrative remedies for it.

### B. Retaliation Claims

A prisoner has a First Amendment right to file grievances against prison officials without being subjected to retaliation in response thereto. *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted).

#### 1. The Search on September 14, 2011 (Claim 6 in Amended Complaint)

Morman claims that defendants Heller, Lee, Taylor and Lavelle searched his cell on September 14, 2011 to retaliate for his complaints. Defendants urge that the retaliation claim fails because Morman cannot show a causal connection, a chilling effect, or the absence of a legitimate penological purpose for the search.

Causal connection: A prisoner must show a "causal connection between the adverse action and the protected conduct." *Watison*, 668 F.3d at 1114. "[M]ere speculation that defendants acted out of retaliation motive is not sufficient." *Wood v. Yordy*, 753 F.3d 899, 904-05 (9th Cir. 2014) (affirming grant of summary judgment where no evidence that defendants knew about plaintiff's prior lawsuit, or that defendants' disparaging remarks were made in reference to prior lawsuit). "[T]iming can properly be considered as circumstantial evidence of retaliatory intent," although timing alone is not enough to support a finding of retaliation. *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995); *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation claim cannot rest on the logical fallacy of *post hoc, ergo propter hoc*, i.e., "after this, therefore because

of this"); *see, e.g., Bruce v. Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003) (retaliatory motive may be shown by the timing of the allegedly retaliatory act and inconsistency with previous actions, as well as direct evidence); *Pratt*, 65 F.3d at 808 (error to find that the allegedly retaliatory action that preceded a television interview was caused by the interview).

Viewing the evidence in the light most favorable to Morman, a reasonable jury could find that Morman's complaining in late August 2011 about the repeated searches and the manner of searches was protected conduct under the First Amendment.[5]  *See Entler v. Gregoire*, 872 F.3d 1031, 1038 (9th Cir. 2017); *Jones v. Williams*, 791 F.3d 1023, 1035-36 (9th Cir. 2015).

Viewing the evidence in the light most favorable to Morman, a reasonable jury could find that Morman's complaining caused C/Os Heller and Lee to choose Morman to be searched. Morman presents evidence that, on September 14, (1) C/O Heller chose Morman to be searched a few weeks after Morman had complained that the searches were being used to harass him; (2) C/O Heller told his coworkers, "we're harassing him"; (3) C/O Lee laughed at Heller's statement and at his opportunity to search Morman's cell; and (4) on several occasions in the few weeks between Morman's August complaining and the September 14 search, C/O Lee had made unduly negative comments to Morman (e.g., that Morman had to shut up, that Morman was ugly, and that Lee would not intervene if another inmate was attacking Morman).  Morman's evidence could allow a jury to believe that C/Os Lee and Heller had lingering irritation about Morman's complaints about the late August 2011 search, and thus distinguish this case from the situation where an adverse act simply follows First Amendment activity by a few weeks.  The negative comments by Lee after Morman's complaints in August provide some circumstantial evidence that the search on September 14 had a retaliatory motivation -- especially given the evidence that C/O Heller said "we're harassing him!" and that C/O Lee laughed in response as the search began on September 14, 2011.  If believed, Morman's evidence would allow a reasonable trier of fact to find that C/Os Heller and Lee searched Morman and his cell on September 14 because of Morman's earlier First Amendment activity.  *See Bruce*, 351 F.3d at 1289 (triable issue existed as to whether the motive

---

[5] The parties agree that Morman's status as a sex offender -- which allegedly was an additional cause of defendants' behavior -- is not constitutionally protected conduct and could not support a retaliation claim.

for a gang validation was retaliatory based on statements indicating that the validation was payback for earlier complaints, combined with suspect timing and the use of evidence previously rejected).

However, the result is different for C/Os Taylor and Lavelle. Morman fails to present evidence that would allow a reasonable trier of fact to determine that C/Os Taylor and Lavelle acted with a retaliatory motive when they acted on September 14, 2011. The evidence shows that, at C/O Taylor's urging, C/O Lavelle confiscated contraband art pastels and that Lavelle provided a property receipt explaining that the pastels had been confiscated because they were contraband. Morman presents no evidence that Taylor or Lavelle made any comment suggesting that they intended to retaliate with their activities related to the search. Nor does Morman present any evidence that Lavelle and Taylor were aware of Morman's complaining about the search in August 2011.

Chilling effect: To prevail on a retaliation claim, a plaintiff must show a chilling effect on his First Amendment rights. The proper inquiry is "'whether an official's acts would chill *or* silence a person of ordinary firmness from future First Amendment activities.'" *Rhodes*, 408 F.3d at 568-69 (quoting *Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999).

Defendants contend that the required chilling effect did not exist because Morman filed written grievances after the cell search. Docket No. 17 at 12. This logic has been squarely rejected by the Ninth Circuit. *See Rhodes*, 408 F.3d at 568-69 (rejecting argument that inmate did not state a claim for relief because he had been able to file inmate grievances and a lawsuit). The fact that Morman continued to complain and filed inmate appeals does not negate the existence of this element because the chilling effect need not be so great as to totally silence the inmate. A reasonable jury could conclude that knowing that one's cell would be searched and property confiscated or damaged during that search as a payback for First Amendment activity would chill a person of ordinary firmness from future First Amendment activities, even in a prison unit where cell searches could be done on a random basis as well as for cause. "A retaliatory search makes a certainty of that which is only a possibility under a policy of truly random cell searches. That is,

an inmate living with a random search policy knows each day that maybe his cell will be searched and maybe it won't, whereas an inmate being subjected to retaliation is led to believe that the price of First Amendment activity is a cell search." *Haddix v. Burris*, 2015 WL 1055768, *6 (N.D. Cal. 2015).

Legitimate correctional goals: The prisoner bears the burden of pleading and proving absence of legitimate correctional goals for the conduct of which he complains. *Pratt*, 65 F.3d at 806. At that point, the burden shifts to the prison official to show, by a preponderance of the evidence, that the retaliatory action was narrowly tailored to serve a legitimate penological purpose. *See Schroeder v. McDonald*, 55 F.3d 454, 461-62 (9th Cir. 1995) (defendants had qualified immunity against retaliation claim based on their decision to transfer prisoner to preserve internal order and discipline and maintain institutional security).

Defendants urge that the retaliation claim fails because the cell search was supported by legitimate correctional goals. Defendants state that random searches of inmates and their property serve a legitimate penological purpose of promoting institutional security by enabling prison officials to confiscate contraband. But defendants fail to acknowledge that Morman's verified complaint described more than a simple search: Morman stated that the cell search included damaging and confiscating his property (other than the art pastels, discussed in the next paragraph below): Morman presents evidence that, during the search, Lee read Morman's legal paperwork, "secretly took plaintiff's photograph of his deceased mother, a straight edged ruler and legal papers, and other items; damaged/broke his typewriter daisy wheel; called plaintiff a flasher." Docket No. 7 at 11-12. Unlike the art pastels, there was no property receipt prepared for the confiscated photo, ruler, or legal papers. Nor was there any suggestion that Lee accidentally broke the typewriter part. A reasonable jury could conclude that a search that included taking some property and breaking other property without any acknowledgment of having taken or broken the property does not serve a legitimate correctional goal. Moreover, defendants do not offer any evidence showing that the search of Morman's cell was a truly random search. *See Bruce*, 351 F.3d at 1289 ("prison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process, when there is a genuine issue of material

fact as to whether the action was taken in retaliation for the exercise of a constitutional right"). There are triable issues with regard to the existence of a legitimate penological purpose for the cell search as it was conducted.

The result is different for defendants Lavelle and Taylor. Morman has presented evidence that C/O Lavelle confiscated art pastels at C/O Taylor's direction at the conclusion of the search on September 14. The evidence is undisputed that Morman's art pastels were not included on a property card that detailed his allowed possessions; the pastels were confiscated because they were contraband; and a property receipt was issued that explained that the art pastels had been confiscated as unauthorized property. Docket No. 17-5 at 5. Morman does not provide any evidence to dispute that this confiscation of contraband served a legitimate penological interest in deterring contraband in the prison. Defendants Lavelle and Taylor are entitled to judgment in their favor because Morman has not raised a triable issue that the confiscation of the contraband art pastels did not serve a legitimate correctional goal.

Morman has established "genuine dispute[s] as to [] material facts" on his retaliatory cell search claim against only C/Os Heller and Lee. Fed. R. Civ. P. 56(a). Summary judgment therefore is not appropriate on the retaliatory search claim against those two defendants. Summary judgment is, however, appropriate for the retaliation claim against defendants Taylor and Lavelle for the September 14 search.

2. The Events on September 28, 2011 (Claim 7 in Amended Complaint)

Morman claims that defendants Lavelle, Lee and Dyer searched and intimidated him into a hearing about his written grievances on September 28, 2011. Defendants urge that this retaliation claim fails because Morman cannot show a causal connection between protected speech and their adverse action, a chilling effect, or the absence of a legitimate penological purpose for the defendants' actions.

Causal connection: Morman has failed to raise a triable issue of fact that defendants took adverse actions because of his constitutionally protected conduct. Unlike the September 14 search -- where Heller commented that they were harassing Morman, and Lee laughed in apparent

agreement -- there is no evidence on which a reasonable trier of fact could conclude that there was a causal connection between their search, handcuffed escort and interview of Morman on September 28 and his earlier First Amendment activity. The September 28 events followed the First Amendment activity, but that timing is insufficient to support a reasonable inference that the September 28 events were caused by the First Amendment activity, especially in light of the evidence that Morman had submitted CDCR-22s requesting an interview or other action and defendants were responding to the CDCR-22s. *See Huskey*, 204 F.3d at 899 (retaliation claim cannot rest on the logical fallacy of *post hoc, ergo propter hoc*, i.e., "after this, therefore because of this"); *Pratt*, 65 F.3d at 808 (timing alone is not enough to support a finding of retaliation).

Legitimate correctional goals: On the evidence in the record, a rational trier of fact could not conclude that defendants' actions on September 28 did not further legitimate correctional goals. The evidence shows that defendants were attempting to conduct an interview with Morman based on his CDCR-22s, which are inmate requests for an interview or other action. Morman has not submitted to the court a copy of any CDCR-22 and has not shown that attempting to interview him for the CDCR-22 was not in furtherance of the legitimate correctional goal. *See* Cal. Code Regs. tit. 15, § 3086(a) (CDCR-22 process is intended to encourage "timely resolution of routine matters through an effective and non-conflictive communication process"). Morman's evidence shows that he did not want to be interviewed and was attempting to avoid being taken to an interview because he worried that something bad might happen to him. But Morman does not present any evidence to contradict defendants' evidence that searching him prior to an unscheduled movement and handcuffing him during that escort did not further legitimate correctional goals of ensuring the safety of staff and other inmates. *See* Cal. Code Regs. tit. 15 § 3274(b)(2); Docket No. 17-4 at 3.

Defendants are entitled to judgment as a matter of law on the claim that defendants Lee, Lavelle and Dyer retaliated against Morman on September 28, 2011 for his First Amendment activities.[6]

---

[6] Defendants also contend that the required chilling effect did not exist because Morman complained "more volubly and formally" after the September 28 incident. Docket No. 17 at 14. This logic has been squarely rejected by the Ninth Circuit. *See Rhodes*, 408 F.3d at 568-69

C.    Qualified Immunity For The Retaliation Claims

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether a government official is entitled to qualified immunity, courts must consider (1) whether the official's conduct violated a constitutional right, and (2) whether that right was "clearly established" at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232.  Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236.

"An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate." *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (alteration and omission in original) (citation omitted).  This is an "exacting standard" that "gives government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Id.* (alteration in original) (internal quotation marks omitted).

> [E]xisting precedent must have "placed beyond debate the unconstitutionality of" the officials' actions, as those actions unfolded in the specific context of the case at hand.  *Taylor*, 135 S. Ct. at 2044.  Hence, a plaintiff must prove that "precedent on the books" at the time the officials acted "would have made clear to [them] that [their actions] violated the Constitution." *Id*. at 2045.
>
> As the Supreme Court again stressed recently, "[t]he dispositive question is 'whether the violative nature of [the defendants'] *particular* conduct is clearly established.'"  Moreover, "[t]his inquiry 'must be undertaken in light of the *specific context* of the case, not as a broad general proposition.'"  *Id.* (emphasis added) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam)).

---

(rejecting argument that inmate did not state a claim for relief because he had been able to file inmate grievances and a lawsuit).  The fact that Morman continued to complain and filed inmate appeals does not negate the existence of this element because the chilling effect need not be so great as to totally silence the inmate.  Thus, the court does not rely on the chilling effect element in determining that Morman's September 28 retaliation claim fails.

*Hamby v. Hammond*, 821 F.3d 1085, 1090–91 (9th Cir. 2016) (alterations in original) (citations omitted) (quoting *Mullenix v. Luna*, 136 S. Ct. 305 (2015) (per curiam).

The "fact-specific, highly contextualized nature of the 'clearly established' analysis" applies, regardless of the constitutional right at issue. *Hamby*, 821 F.3d at 1092. For example, in a case in which the plaintiff alleged prison doctors were deliberately indifferent in pursuing a nonsurgical course of care for a prisoner's hernia, the qualified immunity inquiry required the court to determine whether, at the time of the alleged wrongdoing, it was "'beyond debate' that the prison officials pursued a medically unreasonable course of treatment by declining to refer [plaintiff] for a surgical evaluation." *Id.* Defining the relevant right as a right to be free from deliberate indifference to medical needs was far too general, and would "repeat the same error the Supreme Court has time and again felt compelled to correct." *See id.* at 1095. As another example, in an excessive-force case where officers shot a woman who was holding a knife and ignoring officers' orders to drop the weapon, "it [did] not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness." *Kisela v. Hughes*, No. 17-467, slip op. at 5 (U.S. Apr. 2, 2018).

In the present case, the question is not simply whether, on September 14, 2011, the law prohibited retaliation against prisoners for their First Amendment activities, as that would be defining the relevant right too generally and would "repeat the same error the Supreme Court has time and again felt compelled to correct." *See Hamby*, 821 F.3d at 1094. Instead, the question is a narrower one, tied to the specific facts of this case: viewing the evidence in the light most favorable to Morman, and given existing case law at that time, was it beyond debate that it amounted to unconstitutional retaliation to search a prisoner's cell and confiscate/destroy personal property after he had protested earlier cell searches and perceived harassment by prison officials?

If the evidence showed *only* a cell search with no property damage/destruction, defendants' qualified immunity argument might have a good chance of success because Morman has not identified and the court has not located controlling law in place in September 2011 that prohibited retaliatory cell searches, where no property is confiscated or damaged. Indeed, some out-of-circuit

cases do not even view a search as a sufficiently adverse action for purposes of a retaliation claim. *See Dolan v. Connolly*, 2017 WL 193286, *6 (S.D. N.Y. 2017) (dismissing claim for an allegedly retaliatory search and confiscation of a computer used by prisoner after his First Amendment activity, reasoning that the search did not constitute adverse action in light of the realities of prison life); *Mateo v. Alexander*, 2012 WL 864805, *4 (S.D. N.Y. 2012) ("many district courts in this circuit have concluded that a cell search is insufficient to support [a retaliation] claim"); *id.* (relying on *Hudson v. Palmer*, 468 U.S. 517 (1984), courts have concluded that, even if done for retaliatory reasons, a cell search does not implicate a constitutional right because the prisoner has no reasonable expectation of privacy). Two cases within this circuit have allowed retaliatory cell search claims to survive summary judgment, but both those cases post-date the September 2011 search at issue in Morman's case. *See Saenz v. Chavez*, 2016 WL 8731159 (E.D. Cal. 2016) (triable issue of fact existed as to whether allegedly random search was retaliation); *Haddix v. Burris*, 2015 WL 1055768, *6 (N.D. Cal. 2015) (triable issue of fact precluded summary judgment on retaliatory cell search claim).

But the evidence here, taken in the light most favorable to Morman, shows that the cell search on September 14, 2011 included the unauthorized taking and breaking of Morman's personal property. During the search, a photo, ruler and legal papers were taken without any record being made that they were contraband. Morman's typewriter was broken. (This confiscation/destruction is different from the confiscation of the art pastels; the taking of the art pastels was documented and shown by defendants to have been done for a legitimate penological purpose of eliminating contraband.) As of 2011, the law was clearly established that the confiscation and destruction of an inmate's personal property in retaliation for his First Amendment activities was actionable. The case of *Rhodes v. Robinson*, 408 F.3d 559, decided in 2005, had found an actionable retaliation claim stated by a prisoner who alleged, among other things, that prison officials had "arbitrarily confiscated, withheld, and eventually destroyed his property" and did other wrongs in response to his First Amendment activities. *Id.* at 568. A reasonable officer would not have thought, in 2011, that it was lawful for him to take and break an inmate's property during a cell search. Defendants Lee and Heller therefore are not entitled to qualified immunity on the retaliation claim regarding the September 14 search.

With regard to the events on September 28, 2011, defendants prevail on the first step of the qualified immunity analysis. On the evidence in the record, no rational trier of fact could conclude that defendants' conduct violated Morman's right to be free from retaliation for his First Amendment activity. Defendants therefore are entitled to summary judgment in their favor on their qualified immunity defense, as well as on the merits of Morman's retaliation claim regarding the events on September 28, 2011.

D.    Referral To *Pro Se* Prisoner Mediation Program

The court has granted summary judgment on some claims, but there remains for adjudication Morman's retaliation claim for the search on September 14, 2011. This case appears a good candidate for the court's *pro se* prisoner mediation program.

Good cause appearing therefor, this case is now referred to Magistrate Judge Robert Illman for mediation or settlement proceedings pursuant to the *Pro Se* Prisoner Mediation Program. The proceedings will take place within **one hundred twenty days** of the date this order is filed. Magistrate Judge Illman will coordinate a time and date for mediation or settlement proceedings with all interested parties and/or their representatives and, within five days after the conclusion of the proceedings, file with the court a report for the prisoner mediation or settlement proceedings.

From time to time, prisoner-plaintiffs have refused to partake in mediation and settlement proceedings. Although the court assumes that will not occur in this case, the court wants to make clear the consequences if it does. Judicial resources are consumed preparing for mediation and settlement conferences, and those resources are wasted when a scheduled conference does not proceed. To avoid that happening, plaintiff is now specifically ordered to attend and participate in the mediation or settlement conference proceedings. He does not have to reach a settlement or other resolution of his claims, but he absolutely must attend and participate in all the mediation or settlement conference proceedings. The conference may be set up so that he will appear in person, by videoconference or by telephone -- and he must attend whatever format Magistrate Judge Illman chooses. Plaintiff is cautioned that he may be sanctioned for failure to comply with an order to participate in a settlement conference, and such sanctions may include dismissal of part or

all of the action. *See* Fed. R. Civ. P. 16(a), (f), and 41(b).

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. Docket No. 17. The motion is granted in favor of defendants in all respects, except that defendants Lee and Heller are not entitled to summary judgment on Claim 6 or on their defense of qualified immunity to Claim 6. Claim 9 is dismissed without prejudice to Morman filing a new action alleging his claim against defendants Kilmer and Evans if he ever properly exhausts his administrative remedies for the claim.

This action is now referred to Magistrate Judge Illman for mediation or settlement proceedings pursuant to the *Pro Se* Prisoner Mediation Program. The Clerk will send a copy of this order to Magistrate Judge Illman.

**IT IS SO ORDERED**.

Dated: May 29, 2018

_____
SUSAN ILLSTON
United States District Judge